Our next case is King-Ellis v. The Postal Service. That's the one where we've got all the clerks facing off against each other. Mr. Dowd, if I'm not mistaken, we have two of our former clerks facing each other in this appeal. We were thinking maybe we'd invite our clerks down to ask you questions. Can you answer any questions of the clerk? Okay, excuse me, Mr. Dowd, you may proceed. Good morning, and may it please the Court. Matthew Dowd for Petitioner Karen King-Ellis. I presume the Court's familiar with the record, so I'd just like to get to the three main points I'd like to make today. The first is that the credibility analysis performed by the AJ was both factually flawed and incomplete when you consider what Hillen describes. The second is that the AJ made incorrect and incomplete factual findings with respect to the clock rings, and that goes to the important question of intent. And the third is even if you accept all the factual findings of the AJ, it's not reasonable to demote a 24-year award-winning manager for one incident over the course of a week when that station was understaffed and she was performing a job duty that is unrebutted and is generally not her responsibility. With respect to the first point, the credibility analysis, I recognize this is a court standard of review. In terms of the court generally states it's virtually unreviewable. I agree with that, and that I think is applicable when there is a complete and accurate analysis performed by the administrative judge. In this case, we have two points. One, we disagree with the AJ's finding that it was inherently improbable for Ms. King-Ellis to remember one time on each day within a 24-hour period. The second, a more important point, however, is that the AJ- She was remembering specific times, 848 and 912. That's pretty hard to remember to the minute, isn't it, when you're filling the chart in a week later in some instances? There's only one instance where it was a week later. In every other instance, it was the next business day. And in four out of the six instances, they were within 24 hours. That's one point. The second point is that the government makes a point of this, the AJ made a point of this, in that it sort of discredited Ms. King-Ellis because of the point she remembered times down to the hundredth. That's just a red herring, Your Honor, because the system requires time entries to be entered that way. But isn't it, why can't we defer to her conclusion that it is inherently improbable that, you know, if you take every person in this courtroom and ask them when they got to work yesterday, are they going to remember 848 in the morning? I mean, there is something inherently improbable about recalling those details and that level of detail. Well, this would be for a couple of points. I don't think it's inherently improbable. Maybe it's unlikely. Maybe it's likely. But the fact that it's either likely or unlikely destroys the finding that it's inherently improbable. Inherently improbable just means it's almost impossible to remember. Now, you raise the question, well, what time did I get to work yesterday? I can give a pretty good accurate of what time I got to work yesterday. Can I remember every single thing I did throughout the day? No. And that's not what King-Ellis' testimony was. On six instances, in a course of six days, she remembered one time for one employee. Now, the government and both the government and the AJ tried to make the case that it was her testimony that she remembered everything that was going on. Her testimony is not that. Her testimony and the unrebutted testimony of both her and a former supervisor was that it was pretty likely and pretty possible to remember when a carrier left the office. It was a small station. There were about 15 or 16 carriers. And King-Ellis just testified that she only made the changes that she remembered. Now, I'd like to point to a couple of specific instances that there are some. Judge Rader, you mentioned the fact that in terms of looking at numbers. But there are a couple others. There are three others that are important. And I'd like to focus on those. Now, if you look at the last six pages of the Joint Appendix, it starts at 822, they have the records there of the clock entries. The important point, and this is what the AJ did not go into in terms of its factual findings. The AJ focused on Valerie, which is the first entry. Now, the AJ pretty much ignored the fact that Ramos, the time entry for Ramos, was a manual entry. And so what that meant was that at 11.29, which is maybe 11.15 in the morning, Ramos went in and manually entered a time of 10.76, about 10.45. King-Ellis later came back the next morning, within about 18 hours, and testified to this and said, Now, I remember when Mr. Ramos left, and it was earlier than that, and that's why I changed it. The Postal Service never talked to the carriers. The only person who testified that could remember these dates was Ms. King-Ellis. The Postal Service never made the effort to even ask. So her story changed, right? No, I don't think it did change. Now, the government tries to say that it does change, and it focuses on the letter. And the letter is at J.A. 78. But now, if you look at J.A. 84, and this is right before she gets into the description of the changes, right about the middle of the, towards the end of the second paragraph, she says, Now, what she meant, and I think it's reasonable to interpret that, as she did it because that's what she remembered. But why isn't the A.J. correct that King-Ellis could not have seen Byrd leave at 8.48 if she actually clocked out at 9.27? That is a great answer, and the government focuses on that. And there is unrebutted testimony from King-Ellis' witness, Kay Giles. Now, as you might recognize, I got into this case later. This testimony wasn't included in the Joint Appendix, and I'd be happy to supplement the Joint Appendix if it's helpful.  This is for Byrd, the carrier Byrd. Well, actually, she testified for a few carriers. But with respect to Vallier, Kay Giles testified that based on the times that Vallier left, it's no way you could have done all that and carried an hour off another route and then back by 7.30. It's almost impossible. So there's testimony, and this is unrebutted testimony from one of the witnesses, which the A.J. clearly did not mention, refer to, or even consider in the decision that supports King-Ellis' version of events. Now, I grant that some of the entries seem more damning than others. But the point here, and the point I'm trying to make, is that the judge, the A.J., made a specific finding about intent. Part of the reason why the judge approved the demotion was that she found this as intentional and repeated. Now, I don't think that the A.J. could make a proper intent determination without considering all of the evidence. If you pick and choose, that's not a proper determination of intent. It would be the same thing if the situation- Well, they didn't charge her with falsification, right? That's correct. And if you- Sorry. Go ahead. No, I was going to say that's correct. And if I were here challenging the actual charge, that would be a good point. But here, my point is that the reason and the main reason, I believe, that the A.J. upheld this unreasonable demotion was because she found it to be intentional. And the intent is based on these incorrect findings about the clock rings. What I'm asking for the court to do is simply vacate the opinion, return it to the A.J., make a complete finding about each of the clock rings. It may be that the outcome is the same. But when this decision is based on the intent that's inferred to King Ellis, based on clock rings, and when the fact that the A.J. ignored testimony that supports King Ellis' version of events- Well, we don't know if she ignored the testimony necessarily. As you know, we don't have a requirement that an A.J. or any other court necessarily deal with every single aspect of the testimony and so forth. So I'm not sure it's fair to say it would have been her conclusion. Obviously, she didn't think that testimony swayed her the other way, but I don't think it's necessarily fair to conclude that she didn't consider it. Right? But I think when you put that together with the fact that the A.J. made no factual findings about all of the other clock rings. Now, I'd like to point the court to Figure 1 of the red brief, and this sort of tracks the factual findings made by the A.J. The A.J. focused on six clock rings, and these are six clock rings, one week out of five years that Ms. King Ellis was manager of the station. Now, what is ignored by both Figure 1 of the government brief and by the opinion of the A.J. is that there were at least six or seven other clock rings. And again, the question is, what do those other clock rings show about the supposed intent of Ms. King Ellis? Now, I have a list here, and if we could go through the actual employee everything reports. For example, with- Before your time runs out, let me move you to what I think was your third point here, which is notwithstanding the affirmation of the spec, you think the penalty should have been mitigated. Yes, Your Honor. Can you point me to any of our cases in which we've actually mitigated a penalty, particularly where it didn't involve a discharge, where it involved a demotion? Do you know of any case where we've second-guessed the agency and the board and actually mitigated a penalty? Mitigated a demotion? Yes. Not off the top of my head, Your Honor, but that- And that's probably, if I'm right about that, and I'm not positive I'm right, that's because the level of deference we apply is substantial, is it not? That goes to the overall analysis of the Douglas factors, Your Honor. And with respect to whether it's a demotion or whether it is a removal, that goes to factor one of Douglas, and it's a question of the seriousness of the offense. And I think what could happen here is you look at this and say, well, this is only a demotion. It's not a removal, right, because we see a lot of removal cases. But when you consider the seriousness of the offense and the seriousness of the penalty, demotion basically puts Ms. King-Ellis back to the same position that she held, first held, 24 years ago. She'll turn 58 tomorrow, and she's worked for over a quarter of a century with the Postal Service. And her duty will be to correct clock entries. Is that correct? I was going to mention the irony of that a little later, but yes, Your Honor. It does seem to be a little ironic. Should we hear from Mr. Goodman? Good morning, Your Honors. May it please the Court? First of all, with respect to the credibility determination, the administrative judge had three separate independent reasons why she determined that Ms. King-Ellis' explanation that she had personally seen each of these letter carriers leave the office at that time was not credible. First, she said it was inherently impossible because she didn't think that she could remember it to that level of detail. Secondly, she said it was inconsistent with her written explanation. And that's important because the written explanation is the only thing that the agency had before them when they were deciding what penalty was appropriate here. They had Ms. King-Ellis' written explanation that begins on Joint Appendix page 78. In that written explanation, Ms. King-Ellis explained for each of these letter carriers why she made the change. What real harm did Ms. King-Ellis cause? I'm sorry, Your Honor? What real harm did she cause? This software collects the data for all of the letter carriers so that the post office can decide how long a route needs to be, how many carriers they need per post office, and basically human resource management. I'm sure that one week of entries is not going to change or disrupt a long pattern of practice. I'm still looking for that harm. You're correct, Your Honor. I don't think one week is going to change the whole system. Did it affect the compensation of these carriers whose clock was changed? No, Your Honor. None of these changes affected the compensation except for the one change that she made that actually made sure that that particular employee was paid on that day. So what motivation would she have had to falsify these records? There are a couple of different possible motivations, but more importantly the administrative judge did not find that she had any kind of malicious intent here. There was some discussion earlier about the intent. I believe when the administrative judge was talking about intent, what she meant was that Ms. King-Ellis intentionally made these changes. That's to be contrasted with Mr. Mitchell, Charge 1, where the administrative judge found that this was sheerly an accident. But she intentionally made these changes, and the changes were unwarranted, and therefore she was providing incorrect information into the system, right? You have to conclude that. Yes, Your Honor. She intentionally made the changes, and these changes should not have been made, and therefore there's a problem with the data. What's the motivation for her having done that? As Judge Newman pointed out, there was no pecuniary advantage for any of these employees. No, Your Honor. There are a couple of places in the record, starting again with her written response, where Ms. King-Ellis talks about how important it is to her that she be known as a good manager and that she's won a lot of awards for the efficiency of the operations at her station. And that's a joint offensive. So if the government concedes that was her motivation, then what motivation would she have had to fabricate anything? Her motivation would have been to get it right. Her motivation would have been to make her station look more efficient. And if the letter carriers at her station were spending too much time sorting the mail and not enough time out delivering the mail, then by changing these particular records it made it look like her letter carriers were more efficient. That would indirectly benefit her. But again... Is there any testimony in the record? Did somebody testify that her status and her appraisal of her function was contingent on this efficiency aspect, which is affected by the difference in one hour clocking out or whatever? There's no testimony, Your Honor, that it's directly contingent upon it. There is testimony suggesting that it's important how efficient the operations look and that she is evaluated. The degree to which she's evaluated is not clear. But that she is evaluated based on the efficiency of the operations at her station. Was there testimony that the one hour more or less affected that view? No, Your Honor. There's no indication that these five changes actually resulted in her station looking more efficient and in her getting, for example, an award for that. There's nothing that direct. There's testimony that she would care about this, and there's testimony from her that she did, in fact, care about this. And she said, both in her testimony at the hearing and in her written response, she said, these are the things that matter to me and this is important. But again, what's most important here is that the administrative judge did not reach the question of falsification. She wasn't charged with falsification. It doesn't matter for purposes of this case whether she was doing this for a malicious reason or whether it was just an accident. All the administrative judge found is that she intentionally made these changes, and those changes resulted in her station looking more efficient than it otherwise would have. That's all the administrative judge had to find, and that's all the administrative judge found. So if it was just an accident, what does that mean, that she really did believe? Maybe she was looking at her watch the wrong way, but that she believed that indeed the entries, the revised entries that she put in were correct. Does the government concede that? No, Your Honor. We don't know here. There was no finding as to what her intent was. But even assuming for the sake of argument that she didn't have a malicious intent, she still made a series of changes, and that gets to the appropriateness of the penalty. She made a series of changes, all of which made the station look more efficient, and she didn't give the agency an adequate explanation for why she made those changes. She was the final say at that station. The post office personnel, the supervisor's governor. She gave an answer as to why she made the changes. She said that that's the time in which she observed those people read it. That's the explanation she gave at the hearing to the administrative judge. To the deciding official, the explanation she had was the explanation in her written statements, each of which are belied by the data at page 822 to 827 showing what the software actually indicated. The software indicated a set of changes. Her explanation for each of those postal carriers doesn't line up with that. Well, wait a minute. I mean, her explanation as on page 84 is they were done to correct the clock wings to properly reflect the performance of these carriers on these days. How is that inconsistent with what you testified? She goes on, Your Honor, to explain for each of the letter carriers individually. For example, for Mr. Vallier, she says the only two moves that Mr. Vallier put in were his begin tour and his end tour. If you turn to page 822, in fact, you can see that he put in a move to the street at 1230. Moving to Ms. Bird, she said Ms. Bird never moved to the street on her regular route at 924. In fact, if you look at page 823, Ms. Bird moved to the street at 927. If you look at Mr. Heitzman, she said the carrier failed to move to the street. I moved him to the street at 1048 and deleted my own move, not his at 1148. In fact, that move at 1148 was made by Mr. Heitzman, and she was correcting that. So each of these, and I can go on, each of these are inconsistent with what the time records demonstrated. That's what the agency had before then when they were deciding what penalty to assess. They saw a situation where the manager of the station had made a bunch of changes, and she didn't have an explanation for any of them that lined up with what the software showed. They decided not that she needed to be fired. They decided that she needed to not be the final say at that station. They needed a manager, somebody to supervise her, to oversee her work. So they installed a manager at that station and demoted her to a supervisor somewhere else. But when she does these things then in her new job, the person over her doesn't really monitor everything she does, right? It is the duty of the person over her to monitor this and make sure that it's accurate. I'm sure it's a spot check system, not every single change she makes is monitored, but it is the job of the manager to make sure that the supervisors, which are below the managers, that the supervisors are making changes appropriately. So in her new position, she'll have a manager, somebody overseeing her, making sure that each of these changes are done properly. Again, that's what was before the deciding official. This is clearly not overreaching or an arbitrary decision. They decided that she was rehabilitatable, she could stay in management, but that she needed somebody to supervise her, and that's a reasonable response. And, of course, with this court standard of review, the court just needs to make sure that there was a reasonable exercise of managerial discretion, and this was. If there are no further questions, Your Honor, I'll sit down. Thank you, Mr. Goodman. Mr. Dowd, you have almost three minutes. Just a few points, Your Honor. One, with respect to Berg, one of the factual findings that A.J. did not make with respect to carrier Berg was the change that King-Ellis made that actually shows the carrier on the street for less time. King-Ellis deleted an 1130 move that was manually input by Berg. The A.J. makes no factual findings. Why is this important? Because it goes to the motivation and it goes to the overall intent that the A.J. infers King-Ellis had. Now, the government responded saying that with respect to the new position for King-Ellis, the government responded saying that someone oversees her now. The unrebutted testimony and evidence in this case is that the supervisors do this, and basically they have complete discretion. That was King-Ellis' testimony. No one rebutted it, and there was a supervisor who testified and supported this version of this. So she is now in a position where she's responsible for doing the very thing that they're accusing her of doing intentionally to misrepresent the statistics. Now, with respect to the government's argument that this somehow sways or changes the statistics of the station, that's not supported by the record either. When you look at this, this is five years as a manager of this station. The only instance is one week when she was doing a job of her supervisor who was below her who was out for that week. The only reason this came up was because she was originally charged with an incorrect overtime correction for carrier Mitchell. She was later exonerated by that, but the officials at the station or at the management started looking into other things to support their demotion of Miss King-Ellis. Now, Your Honors, I understand that the deference given to the board in this case is high, but the motion in this case is a serious penalty for something that there's no proven intent to do something malicious or personal gain. This is a complete error on the part of King-Ellis for the findings that the judge made. I'd ask that this court, at a minimum, send this case back to the board, have a complete factual finding for each of the clock rings, including the ones that are omitted from the opinion, and then have the board determine whether this is a reasonable penalty. Thank you, Your Honor. Thank you, Mr. Dowd.